Case No. 233638, B. Oswald Company, et al. v. Dennis Neate, et al. Argument not to exceed 15 minutes per side. Mr. Cooper, you may proceed for the appellants. Good afternoon. Good afternoon. I'd like to thank the Court for allowing us time for oral argument today. I please the Court. My name is Rod Cooper, appearing on behalf of the appellants Dennis Neate, Michael Maitland, Christine Loisel, Annette Blanc, and Heilig Group, Inc. I would like to reserve four minutes for rebuttal, please.  Thank you. This case involves Oswald's attempt to enforce an agreement in restraint of trade, and it's governed by Ohio law. And these types of anti-competitive agreements are disfavored under Ohio law. And it wasn't that long ago where the courts, including the Ohio Supreme Court, were grappling with whether they ought to be enforceable at all. Can I ask you a mechanical question? I'm sorry. The preliminary injunction as it applies to the breach of contract, based on the nondisclosure agreement, is, I take it, is that going to run out here in May? Correct. Okay. Which would moot that part of the appeal if we didn't decide before May. Is that right? So I think that is correct. Okay. Is there a damages action also associated with the breach of contract? There is. And we have counterclaims, I guess, that would be related to being improperly enjoined. Okay. And then the trade secret part, that injunction would still go on, I take it? That's not, if it's, to the extent it's tied to the Ohio and federal statutory provisions, then it's not running out in May, right? Yeah, that's right. Okay. If it was properly entered, it wouldn't run out. So I think what I was trying to get to say is the courts were looking at should we ever enforce these? And the Ramon case, which is sort of a seminal case in this area, decided that there would be circumstances where we would want to enforce those if enforcing them would be for the purpose of preventing employee from engaging in unfair competition with the law. Let me ask this. Two agreements at issue, one is the nondisclosure, then we have the sales agreement. How do we look at those? Do we read those together? Does one supersede the other? So how do we look at those? Okay. So I understand the question. And I assume you're familiar with the facts here. Mr. Neap became employed with Oswald in 2016. And at that same time, two agreements were entered into that were agreements in restraint of trade. Both of them became effective on June 1st of 2016. The one was a non-competition agreement that was entered into in connection with this series of transactions. In that agreement, Mr. Neap agreed that he would not compete with Oswald for a period of five years. And that length of time was, in our view, reasonable because Mr. Neap was selling his business to Oswald. And they would need some protection that he wouldn't turn around the next day and begin competing with them after receiving compensation for selling that business. And so that agreement entered into in connection with the sale of assets is viewed less skeptically by courts than those that are entered into in the employer and the employment context. So there are really two agreements. The five-year – So there's two separate agreements, right? He enters into one because he's selling a business. He's entering into a different one because he's an employee, right? And other employees would enter into that same agreement. And other sellers, perhaps, would enter into the other agreement. But they're two different agreements, right? Entered into in two different capacities. My capacity as seller and my capacity as employee. So the question is, the agreement that he entered into in his capacity as employee is the one – the only one that could be operative because of the timing, right? So that one just rises or stands on its own. I mean, you look at the agreement and say, does it cover what happened here? Does it prevent you from soliciting company accounts as defined in the agreement? And I don't – why isn't that the operative agreement at this point? The other one's dropped away, but he still had signed an employee agreement, right? Right. I agree. That is the agreement. And what I'm saying, that agreement on itself is not enforceable as against Mr. Neid under these facts under Ohio law. Because just under the Raimondi factors, it wouldn't be – there's no legitimate business interest. It's unreasonable. All of that analysis.  Okay. Right. So we're not arguing anymore that the Hoffman agreement is the only one that applies or supersedes it or some merger cause or any of that stuff is dropped away? I don't concede that, I think. But I don't think, as the records develop right now at this stage, what we're really here for is the determination that that NDNSA standing alone is enforceable against Mr. Neid. We dispute that legal finding by the court. But without relation to any argument that it was superseded by a different agreement, we'll acknowledge for the purpose of this appeal that that agreement is in place, and that's the one that we're saying, without relation to the Hoffman agreement, is not enforceable against Mr. Neid. And the reason is because what happened after Raimondi is it basically said, okay, it should be the exception and not the rule that we would allow an anti-competitive agreement to be enforceable. And they decided that they could be in situations where the employer, like Oswald, can show by clear and convincing evidence that the restrictions involved are no greater than necessary to protect a legitimate business interest of Oswald, the employer here. And what brings us here is I don't think the trial court addressed our argument that Oswald does not have a legitimate business interest in preventing Mr. Neid from soliciting these clients that he allegedly solicited post-employment with Oswald. And I don't think Oswald really addresses that argument in the briefs either. There certainly has not been a case that I'm aware of cited that says an employer has a legitimate business interest under the Raimondi standard in preventing an employee from competing with that employer post-employment for clients that the employee developed on his own without involvement of the employer. This case, okay, so the only, this is the argument that if I bring my own clients to the relationship that you don't have a legitimate business interest in protecting them, Oswald paid, I mean Oswald presumably paid your client for him and his information and his client list. I don't understand why they wouldn't have a legitimate business interest in protecting it. I mean if I paid Coca-Cola for the formula, it's mine now, right? You can't say, well, we developed it before you bought us. Right. So, but businesses, human beings and people in businesses are not, you know, the Coca-Cola formula. But I think the better answer to that question. Well, the client list is, I mean, okay, fine, it's not that, but it's something. I'm paying valuable consideration for this business, right? Yes, Your Honor. So if we're talking about the asset purchase, the purchase of Mr. Neat's business, right, Mr. Neat agreed he wouldn't compete with them for five years, and he honored that. And that is the extent of protection that the law would give a party that's purchasing a business. And that was a testimony of the CFO of Oswald at the hearing. He said, if we could have legally gotten more than five years, we would have. And I think the point, there are two cases out of the Northern District of Ohio that I think have very similar facts. And certainly we have detailed opinions from the two judges in those two different cases. One of them, Anthony versus Gallagher, and the other one, Oswald versus Stratos. We've cited them in our briefs. In the Gallagher case, in both of those cases, and I agree Gallagher supports your, I think supports your position about a lesser interest, not no interest, but a lesser interest in a client that they bring. And then there's the Stratos-Oswald case, right, that just seems to kind of follow the Gallagher analysis. But neither of them seem to cite any cases from Ohio, any Ohio State court cases that have recognized this principle. They're both unpublished. I'm just, and they're both, to me, counterintuitive in terms of kind of just because I bring something to the relationship, that the purchaser somehow has a lesser business interest in it. I just, I'm confused about that. Okay, I'm sorry. I think you're continuing to talk about the fact that he sold his business, as opposed to just becoming employed. But it's the client relationships that you're saying. You're saying that he developed these client relationships before he starts. And you're saying that when he leaves, he can continue to compete with the employer, with his new employer, I'm sorry, the second employer that he just left. I can compete for the clients that I had developed before I came to the second employer, right? And I would say, why? The second employer who purchased the business and hired you and paid valuable consideration has an interest in all of that, that you even brought to the table here. Right. So I guess what I was saying was, they don't get a right in perpetuity to have those clients as theirs. Those clients aren't bound to be Oswald customers for the rest of their existence, just because Mr. and Ms. Sullivan. Well, it's not in perpetuity. It's until two years from the date that he leaves the company, right? Right. But I think, I guess our argument is a little bit, well, it's not. But I think the five-year agreement that Mr. Neidt honored was the protection they got for buying the assets. And then he became employed, and there's a separate employment agreement. And when you look at the Ramon factors, they militate in favor of a finding that it would be unreasonable to preclude Mr. Neidt from competing with these clients when Oswald did nothing to help him develop those relationships. And in the Anthony case, it did cite some Ohio case law, including Ramon. And what they, in that case, was a case where Oswald had hired Mr. Anthony away from a rival broker, the Benke Agency. The court noted, yeah, they might have had a protectable interest with that argument that they bought the assets. But that was five years ago, and that interest has dissipated. And they've held after a bench trial in favor of Mr. Anthony on that point, as to whether they could preclude him from soliciting clients that he had brought before. So I see that my time is up at this point. Is that correct?  Any further questions? Thank you. Seeing none, you'll have your rebuttal, Mr. Cooper. Good afternoon. Good afternoon. Thank you for having me today. My name is Steve Zashin, and I'm here with Amit Patel from Zashin & Rich, and we represent the Appalese in this case. And I think it's important to understand that this court should affirm the decision by Judge Charles Fleming in granting Oswald a preliminary injunction in this case, because in this particular instance, Judge Fleming heard from multiple witnesses. He reviewed the exhibits. He held a full evidentiary hearing, including post-hearing briefs, and devoted 20 pages of his decision to the issues surrounding the preliminary injunction in this case. He doesn't say much about Raimond and the Raimond factors and applying those factors, right? He does throughout his decision weave in the issues, though, that are important in the Raimond factors, and specifically the factors that he relies on is the fact that these types of agreements, especially the two-year non-solicitation agreement that you were addressing before, are industry standard. In this particular case, Hyland, one of the defendants in this case, actually imposed the same exact restrictions on those people who it hired, and therefore the court looked at the reasonableness in this case. Maybe they're both unreasonable. That doesn't prove anything. Well, but what it does establish is it establishes that this is an industry standard. These are not non-compete cases. These do not put these individuals out of work. These individuals are certainly free to go to work for a competitor, and certainly in the Raimond circumstance the most significant issue is whether or not it would restrict the individual from actually receiving remuneration for services, and in this case that is not so at all. These individuals have remained employed by the Hyland company and continue to sell insurance. The issues in this case, however, are the use of the goodwill that is associated with what occurred while they were employed at Oswald, and that is what's at issue. But there's no analysis in the opinion of the factors. There's no real analysis of this argument about, hey, look, the preexisting customers, the non-solicitation shouldn't cover the people that I brought to the relationship because of Gallagher, because of the Stratos case. I mean, there's really none of that in the analysis. In this case, Your Honor, there was actually a discussion relative to that in the order itself where he identified the Raimond factors and then went through all of the facts associated with this particular case, and the Raimond factors are the guardrails, but the factors at issue here are the facts which set forth this particular case, and what I think is important is, and this is some of the- The only thing that was really analyzed was the fact that Highland had the same provision. I mean, there's a page about that, and I understand that, but I guess I'm not sure where that fits in the whole analysis. I mean, I'm looking for a little bit more. I mean, in Cromer, we said there's got to be some analysis, right, of the factors. So, Your Honor, I would turn you to pages 14 through 16 of Judge Fleming's order, and he did so based upon the application of the Sixth Circuit's decision in Chicago title, and he went through the factors associated with when it is appropriate to enjoin someone based upon a contract that's at issue in this particular case. I do want to point out something that is interesting, and it's a question that you raised before, which is this whole issue about bringing customers to the dance, so to speak, and the issue in this case is very different, and the case that has addressed this issue in the Sixth Circuit is Hall v. Edgewood, which I believe, Your Honor, you were a decider or a contributing member on Hall 2, which was a case that got brought back to the Sixth Circuit. But what's interesting about Hall 2 was that in that particular case, there was a discussion about the individual who had brought customers to Highland originally. It's ironic that it had to do with Highland. But in that instance, the individual, Hall, had brought the customers to Highland, okay? And then he worked for Highland for a period of time, and the customers that he sought to carve out were those that preexisted, the ones that were sold by Highland to USI. In this case, the evidence demonstrated that Mr. Neate worked for a company called Westfield Insurance. He worked there for a number of years, and then he came to the predecessor, Hoffman, okay? There was no evidence in the record at all concerning what customers, if any, Mr. Neate brought from Westfield to Hoffman. Instead, the only evidence that was adduced at the trial on this issue were the customers that were brought or developed while he was at Hoffman, which Oswald paid $1.3 million for when it acquired the stock of Hoffman. And to your point, I believe that there is, other than Hall, there is no other discussion about a case like this. And in my opinion, the critical fact here is the fact that when a company buys the stock of another company, all of the goodwill associated with it goes with the new company, and there should be no distinction. And there's no evidence in the record that any of these clients that are at issue, because there was only one that they claimed was developed while he was employed at Oswald, it doesn't make any difference. And that's why we cited the Kentucky Bourbon cases and those types of cases, because they sold the goodwill. That's what they sold. And I would also add to that that during the time that they were with Oswald, Oswald actually invested in their business. They provided him with a support team. They provided him with $50,000 in expenses associated with those accounts. That's what's different. If you go back and you look at the Gallagher case. Is that different from Gallagher? It is. And I tried Gallagher, actually, Your Honor. And the difference was there's two critical differences in Gallagher, and I think it's really important. Number one, there was no evidence that Kyle Anthony solicited a single customer in that case. None. Number two, there was no evidence in Gallagher that there was any use of any confidential or proprietary information in that case that came from Gallagher. That's not what's at issue here. What's at issue here is it's very clear that the information, the goodwill, the customer information, the carrier information, the contact information, the lines of coverage information, all of that information, which is not publicly available, was transmitted by Mr. Neate to those at the Highland. What I would also say about Gallagher is. I guess I'm confused about some of those distinctions. I mean, Gallagher seems to say, I mean, look, is it a legitimate, protectable business interest under Ohio law? Hey, it's been five years since the sale. There's no evidence that these customers were developed while he was working at that company. He brought them with him. Under those circumstances, it's not a protectable interest, and the district court here didn't really grapple with that kind of argument. So I guess I'm kind of like, well, should I deal with that, or do we give it back, or what do we do with that? So what I would say to you, Your Honor, is if you actually, if you read the Gallagher decision by Judge Gwynn, what they presented at trial in Gallagher was what kind of wine the customer likes to drink, what kind of movies they like to see. That was the evidence in the Gallagher case, which is cited by Judge Gwynn. That's not the information that is used here. And in addition, in Gallagher, there were affidavits from each of the customers that said, Kyle Anthony didn't have anything to do with us, whereas in this particular case, the evidence was very clear that Mr. Neate himself reached out to each of these customers, created a spreadsheet regarding each of these customers. And if you look at Plaintiff's Exhibit 21, which is the critical piece of evidence, in this case beyond the phone records, there is a tab, the last tab of Plaintiff's Exhibit 21, of customers who expressed no interest in moving to the Highland.  And yet, he provided Highland with information about the premiums of their policies, the lines of coverage of those policies, and the carriers. Right. So, okay, fine. Maybe he's soliciting, maybe that violates the agreement. I don't know. But your friend on the other side's argument, I take it, is with respect to all of those people, they were people that he brought to the dance. And therefore, at Jump Street, it's not a protectable interest. That's it. And I'm saying, like I said before, I'm not sure that's a great argument. I'm skeptical about it. It seems like it's a protectable interest. Somebody paid money for it. But look, somebody needs to analyze it at some point and take it apart and decide whether that's a good way to approach these problems or not. And Gallagher seems to be the only thing we got on that, and maybe the other one. I assume you were part of that other case, too. I was. Okay. So we got two cases. Now we got three. So, I mean, what do we do with it? So there's distinctions here, and I think that's what's important. First of all, both of those cases, you're talking about Stratos and you're talking about Gallagher, okay, Anthony or Gallagher, whatever you want to say. However, those cases deal with different lines of insurance. Those cases involve insurance that are subject to what are called ERISA requirements, which are 5,500 reporting cases. The information contained in those cases is publicly ‑‑ So why does that matter about whether I'm bringing the customer? I'm very simplistic, okay? Okay. I don't ‑‑ I'm just wondering. What do we do with I bring all of these customers and then I leave and I get to solicit all of the people that I had because I had them over here? There's two answers to your question. First is the evidence that was adduced at the hearing, and I asked the question to Kim Riley, who's the chief operating officer of the Highland, and I said, of all the customers that Mr. Neate has now brought to you at the Highland, the ones that he took from Oswald, if he left Highland, would you sue him for those customers? And her answer was, we absolutely would because our contract does not differentiate between it. I would also point your attention to Hall. Hall 1. Because Hall 1 is instructive in that way. And in Hall 1, the issue was the customers, and this is the case that they rely on, it is the customers not that were developed at the Highland, but it was the customers that were developed before the Highland. That was the sequence of events in Hall. In our case, there is no evidence, none, that Mr. Neate developed any of the at-issue customers before he got to Hoffman, which was purchased by Oswald. The sequence of his employment was that he worked for Westfield, then he went to Hoffman, then he went to Oswald, then he went to the Highland. There is no evidence whatsoever that he brought any of the customers to the dance. They were all developed while at Hoffman, which was then purchased by Oswald. Whereas in Hall, that was the distinction. And I think that's what's the important distinction here. And I would also point your attention to Jenkins, which is Judge Barker's decision in the Northern District of Ohio. What's important about Jenkins was the referral sources. And what Judge Barker said is there was no protectable interest in the referral sources because there was no evidence that Union Home had ever invested in the referral sources. So I would argue to you that both Hall and Jenkins both support our position that there was no preexisting development of those customers that were outside of the goodwill that was purchased, in this case, by Oswald. And I think that's what's important. I would also tell you that unlike Gallagher. If he brought them to Hoffman but didn't develop them at Hoffman, that's a difference? It is. That could be a distinction, a differentiating factor. Can I switch gears here for a second?  The injunction, I have some concern about the injunction because it seems to incorporate another document which would violate 62D. I wonder if you would address that. I would. Thank you very much. I would point out a couple things. Number one, they claim confusion relative to Judge Fleming's order. I would tell this court that they agreed six times to the language which is contained in Judge Fleming's order. So if they didn't understand it, I'm not sure why they agreed to it six times. They agreed to it on June 27, 2022. They agreed to it July 11, 2022. Are you talking about in the TROs? They are, but the TROs are virtually the identical language that's associated with Judge Fleming's order. I would also say to you that the- I still wouldn't necessarily save it. I mean, okay, fine. They agreed to it. I don't know. Maybe you, whatever you guys are doing. But, I mean, if under 62D, if it says as defined in the agreement or something, it's incorporating by reference another agreement, and that's just a no-no, isn't it? Well, I think there's a split in authority with respect to that issue, but I would also say that the issues relative to the definitions that he refers to are all actually contained in the order itself. So when he defines customer, right, customer, prospective customer, those are all defined in the actual order itself, and therefore it doesn't violate Rule 65D at all because the standard is would a reasonable person understand what it meant? And what I'd say in that regard is- But you can't understand the injunction without the order. Is that right? No, you can't in this particular case because each of those definitions is expressly identified in Judge Fleming's order itself. They're all written in there. As you said, you need the order and the injunction together. But they're all part of one piece in this particular case, and I would argue that in the case that you're referring to, in Cromer- In Cromer, it was a one-sentence decision, and the issue was you can't compete with Union Home for 100 miles and didn't define what competing meant. And I would also say to you that in Cromer, the difference was is that they filed the motion to clarify with Judge Pearson, and Judge Pearson denied the motion to clarify. I didn't, but I know that case. But they did not, but they did not actually seek any type of clarification from the judge in this case. All they did in this case is they filed a motion to modify because they said it was taking Judge Fleming too long to rule. But at no point in time did they say, we don't understand this. And there was never a situation where they reached out to the court and said, hey, Judge, we need you to clarify this order because we're not sure what these individuals can and cannot do. And there's never been a single situation since the order was entered, since July of 2023, suggesting that there was a violation of that order. So with that, I will close and say that this court should affirm the preliminary injunction. And just one other point, which is the point you made, Judge, which was that the contractual restrictions in this case do dissipate in May of this year, and they will become moot. All right. Thank you. Any further questions? Thank you very much. All right. Four minutes rebuttal. Mr. Cooper. I want to take time to address the Ramon factors as applied to this case and comparatively to what the Northern District did in the Gallagher and the Stratos cases. And when you compare the facts and the reasoning in those two opinions, I think this is not even a difficult case that Oswald should not be permitted to prevent Mr. Neate from competing with Oswald for the clients that Mr. Neate developed on his own. The Ramon factors, stifling the inherent skill of the employee, was the talent of the employee developed during his period of employment? The answers to those are very clearly no. There's no dispute about the fact that Mr. Neate developed all of these clients with no assistance from Oswald, none. And there's no dispute that Oswald provided no training to Mr. Neate. The only evidence whatsoever they put in that they might have strengthened a relationship was one, they asked him did they pay expenses. I think if I told you they paid $50,000. Do you agree that there's a difference between a pure kind of non-competition agreement and like a non-solicitation? I do. And this is not a non-compete. He's working at the company, right? That's right. One of the other factors that's related to that is the disproportional benefit to the employer and the employee. And so here, Oswald, one of the largest, if not the largest, I think probably the largest insurance broker in the Cleveland area, $175 million of annual revenue. Mr. Neate's entire book of business when he left was between $1 and $1.5 million, far less than 1% of their annual revenues. And at the time before he left, Oswald had reduced Mr. Neate's salary by $75,000 and stripped him of the title of market leader that he was promised in his employment agreement when he agreed to the non-disclosure, non-solicitation agreement in 2016. And, in fact, Oswald, perhaps recognizing the changes in the terms of his employment, presented him with a new NDNSA that they would require him to sign to remain employed, and he refused to sign it. And I think if you look at the Ramon factors, there are no – this is not a close call. And I think there are no cases following Ramon that would articulate any type of – Did you – let me ask you real quick about the injunction. Did you guys object to the language in the injunction? We – well, yes. I mean – Well, you objected that it be entered. But, I mean, did anybody – did you say, hey, you can't incorporate this agreement, or by reference that would violate 62D? I mean, after the injunction came out, we promptly appealed and raised that argument here. We didn't – we weren't expecting – What about the prior iterations that you had agreed to in the TROs? So, it was not really a TRO. I don't think that's accurate. It was never adversary. We had always stipulated it was a consent order. At all times, it was called a consent order. For reasons – You went with the language in the consent order. Yes. So, Your Honor, fair enough. We agreed to those terms for a variety of reasons that were practical reasons, and without prejudice to our rights. And we told the clients – We said, hey, while this order is in effect, we don't even know what it means. You can't – don't do anything. Right? Because we don't want you to unwittingly be guilty of violating a court order. And then we had approached the court. You know, Mr. Zastry said we didn't approach the court for clarification. We did. We did by email. It might not be in the record. We said, hey, we really need a status conference. And they said, no, we're – you know, no. And eventually, we filed a motion, an emergency motion, essentially to clarify because we were not – Highland was not able to compete. They were not able to – Every day, we're worried we're going to be in violation of this order because it literally says that any prospect of Oswald anywhere in the world, if we solicit them, we're guilty of violating the order. We don't know who even 1% of those customers are. It could be everyone in the Cleveland area. The agreement is just over broad. It incorporates another document, which on its face, runs afoul of the requirements of Rule 65. And you can't look at that and know what it is we're prohibited from doing. I see I'm out of time. You can finish up here.  And I think – so I wanted to talk about – and I'm not trying to add on, but this is related to the point of the Ramon factors. In the Stratos case, they denied Oswald's motion for summary judgment that they had a legitimate interest in the clients at issue. And they said, unlike in Gallagher, the reason why we can't go ahead and say what it is, because unlike Gallagher, we don't have evidence on three things we'd like to have evidence on, the extent of Oswald's investment in developing the customer relationship at issue, the financial value of the clients to the firm relative to the employee, and whether the client would have entered into the relationship but for Oswald's investment in developing the employee's talent and skill in the profession. And we do have evidence on those things here, and all three of them militate in favor of a fining in my client's favor. Thank you. Very good. Any further questions? Judge Mathis. All right. Thank you, counsel. The case will be submitted. And with that, you may adjourn the court.